[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 20-11467
Non-Argument Calendar
_____

D.C. Docket No. 1:17-cv-02269-SDG

DERICK OKWAN,

            Plaintiff – Appellant,

versus

EMORY HEALTHCARE INC.,
EMORY UNIVESITY, et al,

            Defendant – Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(September 9, 2021)

Before LAGOA, BRASHER, and TJOFLAT, Circuit Judges.

PER CURIAM:

Between July 1, 2014, and March 17, 2016, Dr. Derick Okwan, a Black male born in Ghana, was a resident in the oncology residency training program at Emory University's School of Medicine. Due to poor performance, Dr. Okwan was dismissed from the program prior to the start of his third year. Dr. Okwan then filed suit against Emory Healthcare, Inc., Emory University, and one of his supervisors (Dr. Hui-Kuo Shu), asserting claims of race and national-origin discrimination under Title VII against Emory University and claims of race discrimination under § 1981 against all three defendants.[1]

Dr. Okwan appeals the District Court's grant of summary judgment in favor of the defendants on two grounds. First, Dr. Okwan argues that the District Court erred in considering certain statements from members of Emory's Clinical Competence Committee (the "CCC") because those statements constitute inadmissible hearsay. Second, Dr. Okwan argues that the Court erred in concluding that he failed to show that his race or national origin was a motivating factor in the CCC's decision to dismiss him from Emory University's Radiation

---

[1] Dr. Okwan sued Emory University under Title VII and Emory University, Emory Healthcare, Inc., and Dr. Hui-Kuo Shu under § 1981. We note that although we have never expressly addressed the question of whether an individual can be held personally liable under §1981, our holdings in past cases have suggested that such liability may exist. *See Faraca v. Clements*, 506 F.2d 956, 959-60 (5th Cir. 1975) (affirming judgment holding director of Georgia Retardation Center individually liable under § 1981); *Burstein v. Emtel, Inc.*, 137 F. App'x 205, 208 (11th Cir. 2005) (finding that an individual who did not participate in a decision not to offer an employment contract to the plaintiff-employee was not liable under § 1981 because he did not participate in the decision).

2

Oncology Residency Program. We disagree with Dr. Okwan on both points. On the former, the Court correctly concluded that the relevant statements were not, in fact, hearsay. Furthermore, Dr. Okwan failed to adequately brief this issue and therefore is deemed to have abandoned his challenge to the Court's ruling on this issue. As to the latter point, the record makes clear that Dr. Okwan has provided no evidence that his race or national origin was a motivating factor in the CCC's decision. Accordingly, we affirm.

I.

Between July 1, 2014, and March 17, 2016, Dr. Okwan was a resident in the oncology residency training program at Emory University's School of Medicine. During his first year in the program, Dr. Okwan received several negative comments on his evaluations from attending physicians regarding his poor medical record keeping, mistakes in patient medical charts, poor patient medical examinations, inattention to important plan details, poor communication, and inaccurate contouring,[2] among other things. Dr. Okwan was also the subject of a formal, two-page patient complaint submitted to the Emory Department of Patient Relations. The complaint, which the patient titled "Angry and Afraid," triggered

---

[2] Contouring is the process of mapping or defining the borders of normal organs in proximity to a cancerous tumor. Contouring and treatment plan accuracy is particularly important for patients with brain cancer, cancer near the spinal cord, or for pediatric patients because the treatment areas are so small. With such a small area to work within, there is little room for error.

an investigation by the Vice Chair of Radiation Oncology, the involvement of multiple senior administration personnel, and a formal response letter to the patient.[3] Due to both Dr. Okwan's poor evaluations and the patient complaint, the CCC issued Dr. Okwan an academic warning letter on September 3, 2015.[4] In response to the letter, Dr. Okwan acknowledged his performance deficiencies and committed to improving.

Dr. Okwan continued to receive negative evaluations, however, from the attending physicians monitoring his performance. The CCC therefore unanimously voted to place him on academic probation on November 30, 2015. In addition, Dr. Okwan accrued two more patient complaints between November 1, 2015, and December 31, 2015. Both patients complained that Dr. Okwan was arrogant, condescending, dismissive of their concerns, and made presumptive judgments about them based on their socioeconomic status. Both patients also specifically requested that Dr. Okwan not be involved in their care.

---

[3] Dr. Okwan told a patient and her family that her recent MRI images could not be found because they had been uploaded to the wrong patient's chart by radiology. In fact, Dr. Okwan was looking at the wrong patient chart.

[4] The CCC is composed of six to eight Emory University Radiation Oncology faculty members who meet throughout the academic year to review the performance and progression of each resident. The CCC has the responsibility of deciding which residents advance through the program.

Based on Dr. Okwan's continued performance difficulties, on January 20, 2016, the CCC voted to keep Dr. Okwan on academic probation.[5] In a follow-up letter to the CCC's decision to keep Dr. Okwan on probation, the CCC informed Dr. Okwan that the committee expected to see sustained improvement on all his deficient performance areas and that the committee would conduct a re-assessment of his performance once his next set of evaluations were available. Before those evaluations came due, however, Dr. Okwan was the subject of a fourth patient complaint.

The patient, who was complaining of back pain, was upset that Dr. Okwan had (1) extended his hand for a handshake when his hand was still wet with sanitizing foam and (2) asked her what would happen if he pounded her on her back. The patient could not remember Dr. Okwan's name and referred to him as an "African man" and stated that he was "horrible" and claimed that he was going to "beat her on the back." In a later review of the incident, one of the members of the CCC noted that she thought this complaint was not Dr. Okwan's fault and that patient bias had played a role.

On February 23, 2016, the CCC had a thorough discussion of Dr. Okwan's academic performance, including reviewing his evaluations and his performance

---

[5] Dr. Okwan was the only resident in the program to be placed on probation in the second year of residency.

on rotations since being placed on probation. The CCC also considered recent patient complaints, including the complaint in which Dr. Okwan was referred to as an "African man." It is undisputed that the CCC never discussed Dr. Okwan's race or national origin during any CCC meeting. The CCC ultimately concluded that Dr. Okwan's deficiencies in multiple core areas, including patient care, medical knowledge, professionalism, and interpersonal and communication skills, meant that he could not safely and independently manage radiation oncology patient care. The CCC voted unanimously not to offer Dr. Okwan a contract for his third year in the residency program. Dr. Okwan was informed of the CCC's decision on March 17, 2016.

Dr. Okwan filed suit against Emory University, asserting claims of racial and national origin discrimination in violation of Title VII, and against Emory Healthcare, Inc., Emory University, and Dr. Hui-Kuo Shu, one of Dr. Okwan's supervising physicians, for racial discrimination in violation of 42 U.S.C. § 1981.[6] The defendants answered Dr. Okwan's complaint and following discovery moved

---

[6] Dr. Okwan also originally asserted claims of race and national origin discrimination under Title VI of the Civil Rights Act of 1964, disability discrimination under Title I of the Americans with Disabilities Act ("ADA"), and race and national origin discrimination claims under Title VII based on a theory of discriminatory placement on academic probation, all of which were dismissed by the District Court prior to the motion for summary judgment. The Court also dismissed Dr. Okwan's claims of Title VII race and national-origin discrimination, based on a theory of discriminatory termination, against Emory Healthcare. Dr. Okwan does not challenge these dismissals on appeal. Dr. Okwan also conceded that his additional claims of disability discrimination under the Rehabilitation Act and under Title III of the ADA could not survive summary judgment.

the District Court for summary judgment. They argued that the evidence developed during discovery was insufficient to create a jury issue as to any of Dr. Okwan's claims. The United States Magistrate Judge assigned to the case entered a Report and Recommendation (the "R&R") recommending that the motion for summary judgment be granted.

Dr. Okwan timely filed objections to the R&R. Dr. Okwan argued (1) that the Magistrate should not have relied upon declarations submitted by members of the CCC in ruling on the summary judgment motion because the declarations contained inadmissible hearsay; (2) that the Magistrate erred in concluding that Dr. Okwan failed to present sufficient evidence that race or national origin was a motivating factor in the CCC's decision not to renew his contract; and (3) that the Magistrate Judge erred in concluding that another resident in the oncology residency training program who had been placed on probation for a shorter time period than Dr. Okwan, a Dr. Marchan, was not a valid comparator.

After careful consideration of the record, the District Court overruled Dr. Okwan's objections and adopted the R&R in its entirety. The Court also concluded that the alleged hearsay statements in the faculty declarations were not being offered for the truth of the matter asserted but rather to demonstrate the

declarants' state of mind. As such, the statements did not constitute hearsay and were admissible.[7]

Dr. Okwan now appeals the District Court's grant of summary judgment and raises the same three objections he raised in opposition to the R&R.

## II.

We review the evidentiary rulings of a district court for a clear abuse of discretion. *See, e.g., United States v. Tinoco*, 304 F.3d 1088, 1119 (11th Cir. 2002); *United States v. Veltmann*, 6 F.3d 1483, 1491 (11th Cir. 1993) ("Evidentiary rulings challenged on appeal will not be overturned absent clear abuse of discretion."). We will only reverse if the district court's ruling is manifestly erroneous. *General Elec. Co. v. Joiner,* 522 U.S. 136, 142, 118 S. Ct. 512, 517 (1997).

We review a district court's grant of summary judgment *de novo*, construing all facts and drawing all reasonable inferences in favor of the nonmoving party. *Craig v. Floyd Cnty.*, 643 F.3d 1306, 1309 (11th Cir. 2011). Summary judgment is appropriate when, viewed in the light most favorable to the non-moving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together

---

[7] The District Court agreed with the Magistrate, however, that even if the statements were in fact hearsay, they would be admissible for summary judgment purposes because the declarants could testify at trial. *See Jones v. UPS Ground Freight*, 683 1283, 1293-94 (11th Cir. 2012) (noting that a district court can consider hearsay when passing on a motion for summary judgment if the hearsay statement could be reduced to an admissible form at trial).

with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

Finally, "to obtain a reversal of a district court judgment based on multiple, independent grounds, an appellant must convince us that every stated ground for judgment against him is incorrect." *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680 (11th Cir. 2014). If an appellant fails to challenge on appeal one of the grounds on which the district court judgment is based, he is deemed to have abandoned any challenge of that ground and the judgement is therefore affirmed. *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1306 (11th Cir. 2012).

### III.
### A.

On appeal, Dr. Okwan argues that the District Court erred in concluding that the declarations by various Emory faculty members, declarations which included statements made by other faculty members or patients, could be considered for the purposes of summary judgment. Dr. Okwan argues that these out-of-court statements constitute hearsay and points to the general rule prohibiting the consideration of inadmissible hearsay on a motion for summary judgment.[8]

---

[8] *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293 (noting that the general rule is that hearsay cannot be considered on a motion for summary judgment). Although Dr. Okwan acknowledges that a district court *can* consider hearsay when passing on a summary judgment motion if that hearsay can be reduced to admissible form at trial, Dr. Okwan contends that the

Dr. Okwan, however, completely fails to address the District Court's (proper) conclusion that the alleged hearsay statements were not offered for the truth of the matter asserted and were instead offered to demonstrate the declarants' state of mind.[9] Dr. Okwan has therefore abandoned any challenge on that ground. *See United States v. Jernigan*, 341 F.3d 1273, 1283 n.8 (11th Cir. 2008) (An appellant's failure to plainly and prominently raise an issue on appeal by not "devot[ing] a discrete, substantial portion of his argumentation to that issue" abandons the issue). For this reason alone, then, the Court's ruling on this issue should be affirmed.

B.

Dr. Okwan argues that the District Court erred when it concluded that he failed to present sufficient evidence of race or national origin discrimination under a mixed-motive analysis. For the following reasons, we agree with the Court.

---

District Court erred in assuming that either the faculty members or the patients referenced in the declarations would testify at trial.

[9] In his R&R, the Magistrate accepted Dr. Okwan's assertion that the statements within the declarations were hearsay but found that the statements could be reduced to admissible form at trial. The District Court found that the statements were not hearsay due to the state of mind exception in Rule 803(3) of the Federal Rules of Evidence. We agree with the Court that the out-of-court statements contained in the faculty declarations were not being offered for the truth of the matter asserted and therefore did not constitute hearsay. The Emory faculty members who provided declarations did so to explain why the members of the CCC concluded that Dr. Okwan's residency contract should not be renewed. That is, the declarations were offered to show that the CCC's decision was motivated by Dr. Okwan's consistently poor performance in his residency program, *not* racial or national origin bias.

A plaintiff asserting a mixed-motive claim under Title VII and/or § 1981[10] must offer "evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) a protected characteristic was *a* motivating factor for the defendant's adverse employment action." *Id*. at 1239 (internal quotation marks and alteration omitted, emphasis in original). It is undisputed that the CCC's decision not to renew Dr. Okwan's residency agreement for a third year constitutes an adverse employment action. Dr. Okwan's claim, therefore, turns on whether he has provided sufficient evidence that a protected characteristic was a motivating factor in the CCC's decision not to renew his contract.

Dr. Okwan offers only two pieces of evidence to establish that his race and/or national origin were a motivating factor in the CCC's decision not to renew his contract: (1) the fourth patient complaint that described Dr. Okwan as an "African man" and (2) the fact that another resident, Dr. Marchan, was placed on academic probation for a longer time period than Dr. Okwan. We address each piece of evidence in turn.

1.

---

[10] "Discrimination claims brought under Title VII . . . are typically categorized as either mixed-motive or single-motive claims." *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016). Title VII and § 1981 have the same requirements of proof and use the same analytical framework. *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).

Dr. Okwan argues that "discriminatory input taints a board's decision" and that because the CCC considered the allegedly racist complaint when making its decision, "that alone is sufficient to show that [Dr. Okwan's] status as a member of a protected class played a role in [the CCC's] decision" not to renew Dr. Okwan's contract. Dr. Okwan also argues that the timing of the complaint and the CCC's subsequent decision not to renew his contract demonstrates that the complaint was a "decisive factor" in the CCC's decision. The CCC, Dr. Okwan argues, had planned to wait until after receipt of Dr. Okwan's January and February 2016 evaluations before reaching a decision regarding his contract; after receiving the complaint, Dr. Okwan asserts, the committee chose to meet earlier.

In *Quigg*, we held that an employee challenging a decision made by a board can succeed on a mixed-motive claim if she shows that "discriminatory input" factored into the board's decision-making process. *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1241 (11th Cir. 2016). Because the plaintiff in *Quigg* was able to show that several members of the school board had made statements indicating sex or gender-bias factored into their decision not to renew her contract, we held that the plaintiff had presented sufficient evidence for a reasonable jury to conclude that her sex or gender was a motivating factor in the board's decision-making process. *Id*. at 1241. Key to our analysis in *Quigg*, however, was the fact that the plaintiff was able to show that numerous *board members* had made

12

statements suggesting sex or gender-bias was a motivating factor in their votes against her continued employment. *Id*.  Here, in contrast, Okwan asks us to hold that an allegedly racist statement by a patient who had *no* role in the CCC's decision-making process should be imputed to the CCC simply because the CCC viewed that statement.  This we will not do.  Even assuming that the patient complaint was racially motivated, this would only show that the *patient* expressed racial or national origin bias towards Dr. Okwan.  It is undisputed that Dr. Okwan's race and national origin were not discussed during *any* CCC meeting.  Likewise, there is no evidence that the CCC members made statements concerning Dr. Okwan's race or national origin *outside* of any CCC meetings.

The timing of the complaint does not affect our analysis.  It may be that the CCC chose to meet because Dr. Okwan had received his fourth patient complaint in two years.[11]  Even if this were true, however, the fact that a fourth complaint prompted the committee to meet earlier than expected does not support the inference that the CCC members' decision-making process thereby became "tainted" by the patient complaint.[12]  Dr. Okwan does not dispute that in January and February of 2016 – a time period during which he knew his future as a resident

---

[11] The record is silent as to why the CCC chose to meet before receiving a further set of evaluations.  The fourth patient complaint was made on February 4, 2016.  The CCC voted not to renew Dr. Okwan's contract on February 23, 2016.

[12] That is, even if the complaint was a motivating factor in the CCC's decision to *meet* in February, there is no evidence that allegedly racist statements within it were a motivating factor in the CCC's decision not to *renew* Dr. Okwan's contract.

depended on a substantial improvement in performance – he made late and inaccurate patient consults, overlooked key elements of patient assessments that caused serious errors in patient treatment plans, submitted treatment plans with incorrect contouring of tumors and healthy organs and tissues, and failed to grasp basic radiation field concepts.[13] Dr. Okwan does not dispute that the CCC engaged in a thorough and detailed discussion of his performance during the entire academic year, a process that entailed reviewing *all* his evaluations and his performance on his rotations since being placed on probation. Finally, Dr. Okwan does not deny that the CCC discussed specific and repeated examples of his poor performance, including incorrect and incomplete patient medical record documentation, inattention to detail in patient care, fundamental errors in contouring and prescription writing, errors in patient treatment plans, missing key clinical issues in caring for patients, dishonesty, and lack of empathy and rapport with patients.

In sum, although there is a great deal of evidence suggesting that Dr. Okwan's performance in the oncology residency program was deficient across multiple core areas, including patient care and medical knowledge, Dr. Okwan has

---

[13] Dr. Okwan notes only that his supervisor evaluated him highly in several (other) areas of performance and that he addressed and corrected deficiencies.

simply provided no evidence that race or national origin played any role whatsoever in the CCC's decision not to renew his contract for a third year.

2.

The second piece of evidence that Dr. Okwan presents in support of his claims is the fact that another resident, Dr. Marchan, was placed on probation for a shorter time period than Dr. Okwan. Dr. Okwan argues that the District Court erred in concluding that Dr. Marchan was not similarly situated and therefore was not a valid comparator.

When comparing a plaintiff's treatment to a non-protected employee, the plaintiff and the employee he identifies as a comparator must be "similarly situated in all material respects." *See Lewis v. City of Union City*, 918 F.3d 1213, 1238–39 (11th Cir. 2019) (en banc). "Similarly situated in all material respects" means that the comparator will have "engaged in the same basic conduct (or misconduct) as the plaintiff, . . . will have been subject to the same employment policy, guideline, or rule as the plaintiff, . . . will ordinarily . . . have been under the jurisdiction of the same supervisor as the plaintiff, and . . . will share the plaintiff's employment or disciplinary history[.]" *Id*.

Dr. Okwan and Dr. Marchan are simply *not* "similarly situated in all material respects." Dr. Okwan's performance issues began early in the residency program, resulting in an academic warning letter and then probation in his second

year. Dr. Marchan, in contrast, was not placed on probation until his third year. Dr. Okwan's probation period was extended because he continued to perform at substandard levels. Dr. Marchan, on the other hand, exhibited sufficient improvement to be removed from probation (although his performance later declined again). Dr. Okwan was the subject of four different patient complaints within his first two years of the program. Dr. Marchan, in contrast, received no patient complaints. Indeed, the evidence shows that Dr. Okwan was unique in this respect: he is the *only* resident in the program who was the subject of multiple patient complaints during his or her residency. Finally, it undisputed that the CCC committees that evaluated Dr. Okwan and Dr. Marchan were not identical. Each committee consisted of six individuals, only four of whom served on both. Each committee featured two individuals (Dr. Dhabaan and Dr. Khan for Dr. Okwan, Dr. Diaz and Dr. Fox for Dr. Marchan) who were not members of the other.

    For all these reasons, then, the circumstances giving rise to Dr. Okwan's probation and termination are simply too different, even when drawn in the light most favorable to Dr. Okwan, from those giving rise to Dr. Marchan's to allow an inference of discrimination. Dr. Marchan is not a valid comparator such that his longer probationary period can be used as evidence of the CCC's bias.

IV.

For the foregoing reasons, we affirm the District Court's grant of summary judgment in favor of Emory Healthcare, Inc., Emory University, and Dr. Hui K. Shu.

**AFFIRMED.**

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

September 09, 2021

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number: 20-11467-BB
Case Style: Derick Okwan v. Emory Healthcare, Inc., et al
District Court Docket No: 1:17-cv-02269-SDG

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause. Non-incarcerated pro se parties are permitted to use the ECF system by registering for an account at www.pacer.gov. Information and training materials related to electronic filing, are available at www.ca11.uscourts.gov.** Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Pursuant to Fed.R.App.P. 39, costs taxed against the appellant.

Please use the most recent version of the Bill of Costs form available on the court's website at www.ca11.uscourts.gov.

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call Tonya L. Richardson, BB at (404) 335-6174.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Djuanna H. Clark
Phone #: 404-335-6151

OPIN-1A Issuance of Opinion With Costs